UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEBO CERMEX USA, INC., a Georgia corporation, GEBO CERMEX CANADA INC., a Canadian corporation and GEBO PACKAGING SOLUTIONS FRANCE S.A.S., a French corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ACMI USA, INC., a Georgia corporation, and ACMI S.p.A., an Italian corporation,<br><br>Defendants. | Civil Action No. 1:18-cv-05082-AT<br><br>Jury Trial Demanded |

**GEBO'S RESPONSE TO ACMI'S OBJECTION AND REQUEST FOR CONFIRMATION OF THE SPECIAL MASTER'S REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION**

# TABLE OF CONTENTS

I.   Technology Primer ................................................................... 3

II.  Relevant Legal Principles ......................................................... 6

III. ACMI's Belated Request for Construction of the Term
     "Predetermined" is Irrelevant and Improper ............................. 7

     A.   The Claim Term "Variable" does not Exclude
          "Predetermined" ................................................................. 8

     B.   ACMI Improperly Introduces the Accused Device
          into the Claim Construction Analysis ............................. 11

     C.   ACMI Misuses the Extrinsic Testimony of a Gebo
          Witness to Attempt to Contradict the Intrinsic
          Evidence in the '005 Patent ............................................. 13

IV.  The Patent Office Denied ACMI's *Inter Partes* Petition ......... 15

V.   Conclusion ................................................................................ 15

Plaintiffs (collectively, "Gebo") respectfully request that the Court adopt the Special Master's Report and Recommendation on Claim Construction (Dkt. 87) and dismiss Defendant ACMI's Objection. ACMI's Objection and Request for Reconsideration of the Report and Recommendation confounds claim terms, erroneously imports the accused device into the claim construction analysis, and improperly relies on extrinsic deposition testimony.

I. **Technology Primer**

U.S. Patent No. 6,168,005 (the "'005 Patent") titled "Low Pressure Dynamic Accumulation Table" teaches and claims low pressure dynamic accumulation tables that are used in the production lines of bottling operations. Accumulation tables cope with differences in product flow rates between upstream and downstream specialized equipment that may be operating at different speeds. Exh. 1, 1:13-17; 1:35-1:40. When downstream equipment periodically goes offline (*e.g.*, shrink wrapper that needs to have its plastic roll replaced), the accumulation conveyors regulate the flow of bottles and provide a location for excess bottles to accumulate until the downstream equipment (*e.g.*, shrink wrapper, palletizer, etc.) comes back online. Exh. 1, 3:9-12; 3:46-59.

Once the downstream machine restarts, it will operate at a faster surge rate than upstream machines. The accumulation table stops accumulating and empties the accumulated bottles, allowing the downstream equipment to process the backlog,

3

and the number of products on the accumulation table decreases. In this way, the accumulation table contributes to managing product flow so that the Overall Equipment Efficiency ("OEE") of the line remains high (*e.g.*, above 90%).

The '005 Patent discloses five embodiments of a low pressure dynamic accumulation system, which implement various features of the claimed invention. Exh. 1, 2:42-43; 5:5-7; 5:27-29; 5:46-48; 6:17-19. Annotated Figure 1, set forth below, provides one example of the covered embodiments, where the flow of products is from right to left, the accumulation conveyors are highlighted in light blue, and the feed conveyors are white.



As shown above, the accumulation table disclosed in the '005 Patent includes a feed conveyor with accumulation conveyors positioned on either side, forming an accumulation surface, with both the feed and accumulation conveyors designed to

4

move in the same direction.  Exh. 1, 2:40-67.  Products enter the accumulation table on the feed conveyor 30, at the inlet 22 of the first end 14, and are moved downstream toward the second end 16 of the table.  Exh. 1, 3:24-26; 3:59-62. Products exit the table at the outlets 50, 52 positioned at the second end 16 of the table and adjacent to an accumulation conveyor surface 34, 40, the rate of exit being controlled by the accumulation conveyor.  Exh. 1, 3:24-26; 4:11-27.

Products exit onto output conveyors and are carried further downstream to other equipment.  Exh. 1, 3:19-25.  When the feed conveyor is running, but the accumulation conveyors are not (*i.e.*, when the accumulation table is in "accumulation mode"), products traveling down the feed conveyor cannot readily escape the accumulation table because they would have to transfer over the stopped accumulation conveyor to reach the outlet.  Accordingly, products may accumulate and back up on to the table when a downstream piece of equipment temporarily goes offline or, more generally, when the rate of the downstream equipment is lower than the rate of the upstream equipment.  Exh. 1, 3:46-51.

Both feed conveyors and accumulation conveyors are connected to independent shafts having motors driven by an electronic circuit that may independently adjust the feed conveying speed and the accumulation conveying speed according to the state of the production line.  Exh. 1, Abstract; 3:5-12.

The accumulation conveyors move at a speed slower than the feed conveyor speed. Exh. 1, 3:52-55. When the accumulation conveyors are moving, products may move from an accumulation surface towards an outlet. Exh. 1, Abstract; 2:4-7; 3:56-59; 4:23-27; 7:40-42. An accumulation effect may occur during normal mode, when the accumulation conveyors are moving. Exh.1, 4:45-51.

The accumulation table is provided with sensors that communicate line condition information via signals to an electronic circuit such as a Programmable Logic Controller ("PLC"), which uses the information to send commands that adjust the feed conveying speed and/or the accumulation conveying speed thus accommodating the state of the production line. Exh. 1, 3:28-34; 6:8-17.

## II. Relevant Legal Principles

When construing claims, "the intrinsic evidence and particularly the claim language are the primary resources." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Intrinsic evidence is the evidence in the public record of the patent, and includes the claims, the patent specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Extrinsic evidence, by contrast, "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.

Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "[W]hile extrinsic evidence can shed useful light on the relevant art, … it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (citation and internal quotation marks omitted). A court may not rely on extrinsic evidence that contradicts the intrinsic record. *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015); *see also On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1139 (Fed. Cir. 2004) ("extrinsic evidence…cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence").

## III. ACMI's Belated Request for Construction of the Term "Predetermined" is Irrelevant and Improper

In its Objection to the Report and Recommendation, ACMI, for the first time, asks this court to construe the claim term "predetermined." Dkt. 99 at 20. However, ACMI's new arguments are improper for three reasons: (A) the construed claim language "variable accumulation conveying speed" does not exclude an accumulation conveyor having "predetermined" speeds; (B) ACMI improperly relies on extrinsic, unsupported attorney arguments to introduce the accused device into the claim construction analysis; and (C) ACMI misuses the extrinsic testimony of a Gebo business development director to improperly contradict the intrinsic evidence in the '005 Patent.

### A. The Claim Term "Variable" does not Exclude "Predetermined"

Contrary to ACMI's arguments, none of the intrinsic evidence supports a construction of "variable accumulation conveying speed" that excludes speeds that may be "predetermined." *See e.g.,* Dkt. 99 at 20. To the contrary, claim 1 of the '005 Patent sets forth, *inter alia*, two claim terms:

> "at least one feed conveyor having a <u>predetermined</u> feed conveying speed; . . . ."

Exh. 1, 7:26-27 (emphasis added).

> "at least two accumulation conveyors having a <u>variable</u> accumulation conveying speed that is slower than said predetermined feed conveying speed; . . . ."

Exh. 1, 7:31-33 (emphasis added). The '005 Patent explicitly discloses that the claim term "predetermined feed conveying speed" can be adjusted and therefore is "variable." The '005 Patent teaches:

> The motors 44 and 48 are controlled by an electronic circuit (not shown) that may <u>independently</u> <u>adjust</u> the feed conveying speed and the accumulation conveying speed according to the state of the production line.

Exh. 1, 3:9-12 (emphasis added). Based on the intrinsic record, the Report and Recommendation found:

> The "feed conveying speed," like the "accumulation conveying speed," may be "adjust[ed]" "according to the state of the production line." However, considering the claim as a whole, the "accumulation conveying speed" is "variable" in that (1) the "accumulation conveying speed" is "variable" in *instances* when the "feed conveying speed" is "predetermined," and (2) overall, the "accumulation conveying speed" must remain "slower than"

8

whatever "predetermined feed conveying speed" is chosen depending on the "state of the production line."

Report and Recommendation at 21 (emphasis added).

Therefore, "predetermined" as used in claim 1 is tied to the "feed conveying speed" and provides a reference value for defining and limiting the variability of the accumulation conveying speed. The "feed conveying speed" and "variable accumulation conveying speed" <u>operate independently</u> of each other; and given that the "variable accumulation conveying speed" <u>must operate</u> slower than "feed conveying speed." Exh. 1, 3:9-12

Indeed, the Report and Recommendation is in accord:

> Viewed in light of the specification, that the "<u>feed conveyor</u>" has a "<u>predetermined feed conveying speed</u>" ***does not mean*** that the "<u>feed conveying speed</u>" must remain ***constant*** irrespective of the "<u>state of the production line</u>." Such an interpretation would preclude the description in the specification to "<u>independently</u> adjust the feed conveying speed and the accumulation conveying speed according to the state of the production line."

Report and Recommendation at 117 (underlining and italics added); *id.* at 21-22 (finding that the "phrase 'variable accumulation conveying speed' does not preclude a 'constant speed,' except to the extent precluded by 'a variable accumulation conveying speed that is slower than said predetermined feed conveying speed.'"); *see also* Exh. 1, 3:9-12.

9

Hence, the Report and Recommendation recognized that "predetermined" refers to specific instances, *i.e.*, when the feed conveying speed is momentarily defined to compare with an accumulation conveying speed that is variable and slower than the feed conveying speed. This is consistent with the '005 Patent's discussion of "independently" adjusting the feed conveying speed and the accumulation conveying speed. Exh. 1, 3:9-12.

The '005 Patent consistently specifies that even though the "feed conveying speed" may be "predetermined" it is also variable and adjustable:

> Generally stated, the top surfaces of the <u>feed conveyors</u> 28, 30 and 32 <u>are always in movement</u> in the direction of arrow 60 <u>at a variable feed conveying speed</u>.

*See, e.g., id.* at 3:9-12; 3:40-42. In other words, as recognized in the Report and Recommendation, the predetermined speed would materialize only in some instances:

> Viewed in light of the specification, that the "feed conveyor" has a "predetermined feed conveying speed" does not mean that the "feed conveying speed" must remain ***constant*** irrespective of the "state of the production line." Such an interpretation would preclude the description in the specification to "independently adjust the feed conveying speed and the accumulation conveying speed according to the state of the production line."

Report and Recommendation at 21 (emphasis added); *see also* 3:9-12. Also, it is common sense that switching between predetermined speed values qualifies as a variable speed.[1]

### B. ACMI Improperly Introduces the Accused Device into the Claim Construction Analysis

ACMI's insertion of the operation of its accused accumulation table contradicts settled Federal Circuit precedent. *See SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (*en banc*) ("A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, **not in light of the accused device**.") (emphasis added). In addition, ACMI's use of the claim term "predetermined," to describe its accused accumulation conveyor introduces significant confusion into the claim construction analysis. *Id.*

ACMI's assertions about the accused accumulation conveyors find no evidentiary support. Indeed, they are entirely based on attorney argument:

- "ACMI's <u>accumulation conveyors</u> in fact operate in a "start/stop, on/off" fashion, where the accumulation conveyors <u>run at a predetermined, constant speed</u> once they have started." Dkt. 99 at 3 (emphasis added).

- "Nevertheless, for sake of efficiency, as ACMI does not infringe based on the portion of the proposed construction (*see* no. 1,

---

[1] If "predetermined" must be construed, it should be given its ordinary meaning as it is used in the '005 Patent. *See* Exh. 1 at 3:9-12 and 3:40-42.

11

> above) that a variable speed is not a predetermined speed (*i.e.*, ACMI speeds are predetermined), ACMI does not object to this portion of the R&R. Dkt. 99 at 19-20 (emphasis added).

- "ACMI accumulation conveyors operate at a predetermined, constant speed in a "start/stop, on/off" fashion that is well known in the prior art." Dkt. 99 at 20 (emphasis added).

Attorney argument, unsupported by evidence, is improper in any context. *See Source Vagabond Systems Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) (imposing sanctions on patentee and its counsel for proposing a claim construction without support from the specification or the prosecution history, because doing so "violates nearly every tenant of claim construction and amounts to a wholesale judicial rewriting of the claim"); *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1369 (Fed. Cir. 2012) (finding Rule 11 violation for pursuing an objectively baseless claim construction). Therefore ACMI's attorney arguments should be disregarded.

ACMI's reliance on *Wilson Sporting Goods* to shoehorn in arguments about the accused device is inapposite. *Wilson* dealt with the Federal Circuit's review of a stipulated infringement determination based on the District Court's claim construction, whereas here, the Court is asked solely to review a Special Master's Report and Recommendation. *See Wilson Sporting Goods Co v. Hillerich & Bradsby*, 442 F.3d 1322, 1327 (Fed. Cir. 2006). Even in *Wilson*, the Federal Circuit recognized that where "neither the trial court nor the parties supplied this court with

any information about the accused products," the record on appeal afforded "no opportunity to compare the accused products to the asserted claims." *Id.* at 1327. Such is certainly the case here.

ACMI's attempt to infuse the claim construction analysis with unsupported, attorney arguments about the accused device is legally incorrect and brings confusion in the current debate of construing "variability". *See e.g., SRI Int'l*, 775 F.2d at 1108.

    **C.**    **ACMI Misuses the Extrinsic Testimony of a Gebo Witness to Attempt to Contradict the Intrinsic Evidence in the '005 Patent**

ACMI relies on extrinsic evidence, namely, the deposition testimony of Mr. Mike De Cotiis, a Gebo Sales Director responsible for "… the development of Engineering and Material Handling for North America for all EMH product portfolio (engineering, conveying, Tunnel machines and EOL)."[2] Exh. 2 – Deposition Exh. 131 (LinkedIn Bio). ACMI incorrectly asserts that Mr. De Cotiis "was in charge of the research and development project that led to the 005 Patent." Dkt. 99 at 14. However, Mr. De Cotiis testified otherwise:

> Q: Did you have any personal involvement in that research and development process, or was that handled within the R and D group?

---

[2] Contrary to ACMI's Objection (Dkt. 99 at 5), Mike De Cotiis <u>is not</u> "… a high-level officer" of any Gebo entity.

A: No. I wasn't personally involved. I put to them the problem, and they developed the solution.

Exh. 3, De Cotiis Deposition, 11:3-7[3].

On further questioning from ACMI's counsel, Mr. De Cotiis admitted that he had not read the '005 Patent prior to his deposition testimony.[4] Exh. 3, 16:6-9. ACMI then questioned Mr. De Cotiis on the meaning of '005 Patent claim terms without referencing the patent.

Regardless of how Mr. De Cotiis' testimony is interpreted, it is improper for ACMI to use his testimony to rebut the clear intrinsic record. *See, e.g., Summit 6,* 802 F.3d at 1324; *Vitronics,* 90 F.3d at 1585 ("Courts should not rely on extrinsic evidence to resolve ambiguities if intrinsic evidence will resolve them"). Further, none of the testimony relied upon by ACMI is related to questioning about the meaning of "variable accumulation conveying speed" in the '005 Patent. To the contrary, ACMI tries to bend Mr. De Cotiis testimony, implying that the accused products are well known technology, which is a mischaracterization of what he said and irrelevant to claim construction.

---

[3] Portions of Mr. De Cotiis' deposition transcript, Exh. 3, have been redacted as "Highly Confidential – Attorneys Eyes Only" to permit this brief to be filed publicly.

[4] Mr. DeCotiis' testimony was sought by ACMI to investigate Gebo's damages claims.

## IV. The Patent Office Denied ACMI's *Inter Partes* Petition

In September 2019, ACMI, along with Alliance Industrial Corp., filed a Petition for *Inter Partes Review* ("IPR") of the '005 Patent with U.S. Patent and Trademark Office's Patent Trial and Appeal Board ("Board"). IPR 2019-01647, Paper No. 3. Subsequent to ACMI filing its Objections to the Report and Recommendation, on March 24, 2020, the Board denied institution of the IPR. *See* Exh. 4 (IPR 2019-01647, Paper No. 9), holding that none of the prior art submitted by ACMI, either alone or in combination, created a substantial new question of patentability. *Id*.

## V. Conclusion

The Report and Recommendation provides a thorough analysis of the claim construction issues, and ACMI has not directed the Court to any errors. Therefore, Gebo respectfully requests that the Court deny ACMI's Request for Reconsideration and adopt the Report and Recommendation on Claim Construction.

Respectfully submitted,

| | |
|---|---|
| Date: April 10, 2020 | */s/ Robert Hart* <br> Robert Hart (*pro hac vice*) <br> AddyHart P.C. <br> 401 North Michigan Avenue <br> Suite 1200-1 <br> Chicago, IL 60611 <br> (312) 834-7701 <br> robert@addyhart.com |

Meredith Addy (Bar No. 473555)
AddyHart P.C.
10 Glenlake Parkway, Suite 130
Atlanta, GA 30328
(312) 320-4200
meredith@addyhart.com

Craig McLaughlin (*pro hac vice*)
AddyHart P.C.
15 Hubble, Suite 200
Irvine, CA 92618
(949) 338-7353
craig@addyhart.com

N. Andrew Crain (Bar No. 193081)
Thomas Horstemeyer, LLP
3200 Windy Hill Rd. SE, Suite 1600E
Atlanta, GA 30339
(770) 933-9500
andrew.crain@thomashorstemeyer.com

Attorneys for Plaintiffs Gebo Cermex USA Inc., Gebo Cermex Canada Inc., and Gebo Packaging Solutions France SAS

# CERTIFICATE OF SERVICE

The undersigned certifies that on April 10, 2020, a copy of the foregoing Gebo's Response To ACMI's Objection And Request For Confirmation Of Special Master's Report And Recommendation On Claim Construction was filed via the Court's CM/ECF system and hence, served by email on all parties who have appeared in this case and agreed to electronic service in accordance with the Court's CM/ECF system.

/s/ *Robert Hart*
Robert Hart
